1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,              Case No. 25-cr-00079-AMO-1   (KAW)

8                    Plaintiff,

9            v.                             **ORDER GRANTING MOTION TO
                                            REOPEN DETENTION HEARING AND
10   NOAH KANAYE BAUER,                     RELEASE DEFENDANT ON
                                            CONDITIONS**
11                   Defendant.
                                            Re: Dkt. No. 19
12

13           On March 10, 2025, Defendant Noah Kanaye Bauer was charged with violating 18 U.S.C.

14   § 922(o) (transfer or possession of a machinegun).  (Compl., Dkt. No. 1.)  Following a detention

15   hearing, the Court ordered Defendant to be detained pending trial.  (Detention Order, Dkt. No. 11.)

16           On June 9, 2025, Defendant filed a motion to reopen the detention hearing pursuant to 18

17   U.S.C. § 3142(f), and to order Defendant released on conditions.  (Def.'s Mot. to Reopen, Dkt.

18   No. 19.)  Having considered the parties' filings, the relevant legal authority, and the arguments

19   made and the testimony heard at the July 18, 2025 hearing, the Court GRANTS Defendant's

20   motion to reopen the detention hearing and release Defendant on conditions.

21                         **I.    BACKGROUND**

22           The charge arises out of a September 6, 2024 search by the Brentwood Police Department

23   ("BPD").  (Compl. ¶ 9.)  That day, BPD officers responded to a call regarding two individuals --

24   later identified as Defendant and his brother -- at a Raley's Grocery Store, one of whom was

25   holding a black handgun.  (Compl. ¶ 7.)  BPD officers detained Defendant and his brother,

26   removing a black 3D printed Glock style firearm from Defendant.  (Compl. ¶ 7.)  Defendant

27   consented to a search of his home; during the search, BPD officers located a 3D printing machine,

28   three 3D printed pistol frames, and a 3D printed machinegun conversion device found in two

1    separate pieces.  (Compl. ¶ 9.)  On testing, the machinegun conversion device broke; the ATF

2    officer conducting the test believed that the polymer used in the 3D printing process was not

3    sufficiently resilient to be used in a pistol.  (Compl. ¶ 13.)

4         On March 17, 2025, the Court held a detention hearing.  (Dkt. No. 9.)  The Court ordered

5    Defendant detained after finding that there was clear and convincing evidence that no condition or

6    combination of conditions of release would reasonably assure the safety of any other person and

7    community.  (Detention Order at 2.)  In so finding, the Court pointed to Defendant's possession of

8    the 3D printed handgun at the Raley's, his manufacture of the machinegun conversion device, and

9    his possession of instructions for manufacturing an AR-15 style weapon.  (*Id.* at 3.)  The Court

10   further raised concerns that Defendant "appear[ed] fixated on mass violence," noting Defendant's

11   internet history subscribing to antisemitic and white supremacist content (including Holocaust

12   denial, "race purity" arguments, and "great replacement" conspiracy theories), searches of mass

13   murderers, and searches for weapons armor and guns that could penetrate police armor.  (*Id.*)

14        On June 9, 2025, Defendant filed the instant motion to reopen the detention hearing and

15   release Defendant on conditions.  In support, Defendant proffered a risk assessment by Dr. Sophia

16   Moskalenko, an expert on the psychology of radicalization, terrorism, and violent extremism.

17   (Def.'s Mot. to Reopen, Exh. A ("Moskalenko Report") at 1.)  Dr. Moskalenko opined that

18   Defendant presented "a very low risk of violent extremist action."  (*Id.* at 2 (emphasis omitted).)

19   In reaching her conclusion, Dr. Moskalenko reviewed case materials and conducted five hours of

20   in-person interviews with Defendant.  (*Id.*)  Dr. Moskalenko then used three risk-assessment

21   instruments -- Activism/Radicalism Intentions Scale ("ARIS"), Violent Extremist Risk

22   Assessment tool, 2nd Ed., Revised ("VERA-2R"), and Need for Significance Radicalization Scale

23   ("NFSRS").  (*Id.*)  Each risk-assessment tool found a low to extremely low risk of violent action

24   by Defendant.  (*Id.* at 7-8.)  Thus, Dr. Moskalenko opined that Defendant "d[id] not present a risk

25   of violent extremist action," and made recommendations to mitigate the risk of future

26   radicalization.  (*Id.* at 9-10.)  In the alternative, Defendant argued that his ChatGPT search history

27   and his intentions during the Raley's incident constitute new information that warranted reopening

28   the detention hearing.  (Def.'s Mot. to Reopen at 7-10.)

United States District Court
Northern District of California

2

On June 11, 2025, the Court granted Defendant's motion to reopen detention, setting a reopened detention hearing for July 18, 2025. (Dkt. No. 25.) On June 28, 2025, the United States filed an opposition, challenging the reopening of the detention hearing and Dr. Moskalenko's report. (Gov't Opp'n, Dkt. No. 31.) On July 11, 2025, Defendant filed a reply. (Def.'s Reply, Dkt. No. 36.) At the July 18, 2025 hearing, Dr. Moskalenko responded to questioning by counsel for Defendant and the United States, as well as by the Court. (*See* Dkt. No. 41.)

## II.    LEGAL STANDARD

Under the Bail Reform Act, an authorized judicial officer may order the detention or release of a defendant pending trial. 18 U.S.C. § 3142(f). The judicial officer may detain a defendant where the government shows by clear and convincing evidence that no release condition will reasonably assure the safety of the community. Specifically, detention may be ordered where the court finds no conditions or combination of conditions could prevent the defendant's continued or future criminal activity. *United States v. Salerno*, 481 U.S. 739, 742 (1987). Additionally, the judicial officer may detain a defendant if the government proves by a preponderance of the evidence that the defendant poses a risk of flight. *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

## III.    DISCUSSION

### A.    Reopening Detention Hearing

As an initial matter, the Court considers whether it was proper to reopen the detention hearing. Pursuant to § 3142(f), a court may reopen a detention hearing if the court "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." This section "is not properly employed as a vehicle for granting a do-over to present evidence that a defendant knew he could have investigated before the detention hearing." *United States v. Adams*, No. 24-121, 2024 U.S. Dist. LEXIS 167997, at *8 (E.D. La. Sept. 18, 2024) (internal quotation omitted). Thus, "[c]ourts interpreting 'new and material information' for purposes of § 3142(f) require truly changed circumstances, something unexpected, or a significant event, and courts

1    have interpreted the requirements of this provision strictly.  New counsel and/or a better argument

2    is not new information within the meaning of § 3142(f)." *Id.* at \*8-9 (internal quotations omitted);

3    *see also United States v. Bothra*, No. 19-1953, 2019 U.S. App. LEXIS 39335, at \*2 (6th Cir. Nov.

4    5, 2019) ("To reopen a proceeding, a defendant must first establish that the information was not

5    previously known to him."); *United States v. James*, No. 23-50044, 2023 U.S. App. LEXIS 11250,

6    at \*2 (5th Cir. May 8, 2023) (affirming denial of motion to reopen where the defendant did not

7    establish that the information was "new or was unknown to him at the time of the previous

8    detention hearing or why he could not have obtained it earlier").

9        To the extent Defendant relies on his ChatGPT searches and the circumstances at Raley's

10    as new information, the Court agrees with the United States that this does not constitute

11    information "not known to the movant at the time of the hearing" as required by § 3142(f).  While

12    Defendant argued at the hearing that counsel was not provided certain discovery, that discovery

13    still pertained to Defendant's own actions and his intentions; thus, it was information that was

14    known to Defendant at the prior detention hearing.

15        The Court, however, finds that Dr. Moskalenko's risk assessment is material information

16    that was not known at the time of the prior detention hearing, and thus warrants reopening the

17    detention hearing.  While the United States is correct that Dr. Moskalenko's risk assessment is

18    based on an interview with Defendant, Dr. Moskalenko employed her particular expertise in the

19    psychology of radicalization, terrorism, and violent extremism, as well as her specialized training

20    on assessing risk.  This constitutes new information not previously known to Defendant.  *See*

21    *United States v. Kroger*, No. 24-cr-85 (1) (DWF/DLM), 2024 U.S. Dist. LEXIS 118045, at \*18

22    (D. Minn. July 2, 2024) ("The mental health evaluation, combined with Dr. Kenning's testimony,

23    represents material information that was not known at the time of the detention hearing.  This is

24    because . . . she has a particular expertise in forensic psychology and specialized training on

25    assessing risk.  Dr. Kenning employed these tools to render an opinion on Mr. Kroger's risk to

26    community safety, evaluating him through interviews and a review of relevant records."); *United*

27    *States v. Littlebull*, No. 1:24-cr-2081-SAB, 2025 U.S. Dist. LEXIS 9792, at \*4 (finding that the

28    defendant's mental health evaluation and availability of inpatient treatment constituted material

United States District Court
Northern District of California

4

information not known to Defendant); *contrast with United States v. Caruso*, Case No. 20-cr-165-PHX-JJT, 2021 U.S. Dist. LEXIS 87259, at *6-7 (D. Ariz. May 6, 2021) (finding that an expert report regarding the defendant's crypto holdings was not new information because it merely reiterated information the defendant already knew without adding any new information). The Court further finds that the risk assessment is material because it concerns the Court's findings regarding danger to the community, including directly addressing the Court's concerns that Defendant was a danger due to his subscribing to antisemitic and white supremacist ideology and an apparent fixation on mass violence. (*See* Detention Order at 3.) Thus, the Court finds that reopening the detention hearing was warranted.

**B.    Safety of the Community**

"[R]eopening the detention hearing is only the first step," as the Court must still consider the factors outlined in § 3142(g) -- the nature and circumstances of the offense, the weight of the evidence, Defendant's history and characteristics, and the nature and seriousness of the danger to any person or the community posed by Defendant's release. *Kroger*, 2024 U.S. Dist. LEXIS 118045, at *9.

The Court previously found that detention was warranted in part due to the weight of the evidence against Defendant, the lengthy period of incarceration if convicted, the lack of stable employment, and Defendant's mental health history. (Detention Order at 2-3.) Still, under ordinary circumstances, the nature and circumstances of the case would usually warrant release. The Court, however, found that certain personal characteristics heightened the risk. Specifically, the Court articulated its grave concerns regarding Defendant's antisemitic and white supremacist views and apparent fixation on mass violence, coupled with his ability to manufacture a machinegun conversion device and an AR-15 style weapon and his possession of a 3D printed handgun in a grocery store. (*Id.* at 3.)

The Court finds that Dr. Moskalenko provided persuasive and reliable expert testimony demonstrating that Defendant presents a very low risk of violent extremist action, despite his views. As a general matter, Dr. Moskalenko explained both in her report and at the hearing that it is a common misconception to assume that extremist and/or radical beliefs will lead to violent

United States District Court
Northern District of California

action, as most individuals with radical opinions will not act upon them. (*See* Moskalenko Report at 5.) Thus, it is insufficient to simply consider radical beliefs; rather, it is necessary to analyze beliefs and other important relevant factors. In the case of Defendant, Dr. Moskalenko explained that despite his antisemitic views, he did not express hatred against Jewish people or a desire to harm Jewish people, *i.e.*, a feeling that they are less than human, do not deserve to live, or need to be eliminated. (*See id.* at 4-5.) Further, Defendant specifically disavowed violent action to defend his political beliefs. In explaining why he would never commit a mass shooting, Defendant cited both his Christian beliefs and his pragmatic views, noting that a mass shooting was akin to "throwing your life away." (*Id.* at 4.) In contrast, Defendant expressed clear future plans, including his career, his website design, his friends, and a desire to have a family. Based on these interviews and her review of the case materials, Dr. Moskalenko used the three assessment tools to produce scores for her report. Dr. Moskalenko found that the agreement across the three measures further suggested an accurate review of Defendant's risk assessment. Dr. Moskalenko emphatically opined that Defendant was not fixated on mass violence.

In its opposition and on cross-examination, the United States raised a number of concerns regarding Dr. Moskalenko's methodology and conclusions. The Court, however, finds that Dr. Moskalenko persuasively responded to these concerns. For example, the United States raised concerns that Dr. Moskalenko did not interview Defendant's family members, friends, or therapist, and did not review mental health records. (*See* Gov't Opp'n at 6.) This was of particular concern because one of Defendant's family members reported that Defendant often fabricates or makes false statements that are advantageous to him, thus creating doubt about the validity of Defendant's statements. (*Id.* at 8.) Dr. Moskalenko, however, persuasively explained during the hearing why she believed Defendant was not lying, explaining that when individuals try to self-present in a light they believe is favorable, they tend to be very consistent across even tiny, minute little things. Defendant, however, admitted to counter-cultural views that did not present favorably, including his belief in conspiracy theories such as replacement theory. Dr. Moskalenko explained that if he was trying to self-present, he would not be so willing to admit to beliefs that would not put him in a favorable light. Dr. Moskalenko also noted that radicalized individuals

United States District Court
Northern District of California

1    tend not to conceal because they like to discuss their beliefs.  Further, Dr. Moskalenko noted that

2    while two of her assessment tools relied on self-reporting, the third -- VERA-2R -- was not a self-

3    reporting measure.  Regardless, the three assessment tools were still in agreement.

4         The United States also raised concerns about the assessment tools themselves, including

5    whether they were valid measures.  (Gov't Opp'n at 6-7.)  Dr. Moskalenko explained how each of

6    the tools worked and their use around the world, including the use of NFSRS for risk assessment

7    in de-radicalization programs in the Indonesia and the Philippines and the use of VERA-2R by

8    Quantico and for do not fly designations.  With respect to concerns that ARIS was weighed

9    heavily to detect a propensity for non-violent, legal acts (*see* Gov't Opp'n at 7), Dr. Moskalenko

10   explained that the validity of a measure is comprised of many things, including discriminate

11   measures to separate out legal activism.  Dr. Moskalenko also noted that VERA-2R is widely used

12   by law enforcement and courts because they have high reliability and validity.  While she

13   acknowledged that the terrorism research community uses ARIS more, she explained that this is

14   why she used both in her risk assessment.  As to the United States' questioning about the limited

15   predictive value of these assessment tools, Dr. Moskalenko explained that with all instruments

16   used to assess radicalization, the future generally cannot be predicted because radicalization is not

17   a linear process.  Further, the type of research necessary to actually create a predictive survey

18   would be difficult because it would require assessing a large number of people of their risk before

19   following them for 10-30 years to determine if the score was actually predictive.  As terrorism is a

20   rare event, this would thus require assessing and following millions of people to actually get

21   enough individuals engaging in political violence to get a predictive view.  In short, *prediction* and

22   *assessment* appear to be different things, with the ability to predict requiring specific surveys that

23   are not practical.  This inability to predict, however, does not mean that the assessment tools are

24   unable to reliably assess an individual's risk for violence.

25        The United States further noted that if Dr. Moskalenko did not believe Defendant was at

26   risk of committing violence, there was no need to recommend conditions of release.  (Gov't Opp'n

27   at 8.)  Dr. Moskalenko had not, however, opined that Defendant presented no risk.  Rather, she

28   concluded that Defendant presented a low risk of violence. Dr. Moskalenko explained at the

hearing that it is her practice to recommend measures to reduce risk and further explained that radicalization is not a static metric but something that can change depending on one's experiences. Thus, the recommendations are a recognition that Defendant has certain specific vulnerabilities that could benefit from measures to reduce the likelihood that exposure to online materials will radicalize him in the future.

The United States further questioned whether Dr. Moskalenko had considered Defendant's manufacture of the firearms and conversion device. Dr. Moskalenko explained that she had, but that the primary risk factor is experience with weapons, such as military training or the building of bombs. Thus, the fact that Defendant printed a gun was less relevant than the fact that he never shot it. She further noted that the conversion device broke, so it was incapable of doing damage and further suggested a lack of experience with weapons.

The Court also reviewed its prior detention order with Dr. Moskalenko at the hearing, asking for an opinion as to the Court's prior findings. Dr. Moskalenko correctly observed that the Court had two primary concerns: Defendant's intention, *i.e.*, his ideological beliefs, and Defendant's capacity, *i.e.*, his printing of the 3D firearms and the machinegun conversion device. Dr. Moskalenko explained that risk tends to be capacity multiplied by intention, but if the intention is negligent, then the risk is negligent. Dr. Moskalenko explained that she believed the intention was negligent because the kind of beliefs he engaged in were not the type that were the most radical such as dehumanization, which would be a more serious concern. Dr. Moskalenko also noted that the capacity side seemed questionable, and that taken together, Defendant was a low risk.

Taken together, the Court is satisfied that Dr. Moskalenko has addressed its primary concerns in previously detaining Defendant, which was the effect of his extremist views and apparent fixation on mass violence (the latter of which was adamantly rejected by Dr. Moskalenko). The Court further notes that as noted in the complaint, the machinegun conversion device broke during testing, and did not appear to be usable due to the polymer being insufficiently resilient. This further suggests that Defendant lacks the means to be a significant risk to the community, such that the Court can find a condition or combination of conditions that

will reasonably assure the safety of the community.  The Court also takes into consideration Pretrial Services' July 23, 2025 Addendum Report, which recommends release with certain conditions imposed, including additional conditions to those previously proffered in the March 14, 2025 pre-bail report.  (*See* Dkt. Nos. 7, 44.)

Accordingly, the Court will release Defendant on a $50,000 unsecured bond co-signed by Leslie Bauer and Charles Bauer, with the following conditions imposed:

1. Defendant must submit to supervision by Pretrial Services and must report immediately upon release and thereafter as directed to Pretrial Services;

2. Defendant must surrender all passports and other travel documents to Pretrial Services forthwith and must not apply for other passports or travel documents;

3. Defendant must not possess any firearm, destructive device, or other dangerous weapon;

4. Defendant must not use alcohol to excess and must not use or possess any narcotic or other controlled substance without a legal prescription;

5. Defendant must participate in mental health treatment as directed by Pretrial Services;

6. Defendant must not change residence or telephone number without prior approval of Pretrial Services;

7. Defendant must remain in the custody of custodians Leslie Bauer and Charles Bauer at 1120 Santa Margherita Way, Brentwood, California.  The custodians must supervise Defendant and report any violation of a release condition to Pretrial Services.  A custodian who fails to do so may be prosecuted for contempt;

8. Defendant must not travel outside of the Northern District of California;

9. Defendant must remain at his residence at all times except for: medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-approved obligations; or other activities approved in advance by the Court;

10. Defendant must submit to location monitoring as directed by Pretrial Services;

11. Defendant must remove any 3D printers from his residence, and must not use any device capable of making weapons;

United States District Court
Northern District of California

12. Defendant must have only one internet capable device monitored by Pretrial Services and may not access any firearms/weapons internet sites or any hate speech/internet websites;

13. Defendant shall participate in a face-to-face community program or with mentors who specialize in supporting individuals at high risk of radicalization, such as Life After Hate and Parents for Peace;

14. Defendant shall engage with a local Jewish organization active in building bridges and who has experience connecting with individuals who hold antisemitic views, such as the Jewish Community Relations Council; and

15. Defendant shall complete a structured media literacy or digital literacy course focusing on critical thinking about online content, such as Basic Information Literacy or Advanced Information Literacy by State University of New York, with enrollment and completion verified by Pretrial Services within six months of release.

A bond signing hearing is set for July 28, 2025, at 10:30 am, in Courtroom 4 at which time Defendant's bond co-signers/custodians (who must be present) and Defendant will receive advisements and sign the bond. After the bond is fully executed, Defendant will be ordered released from the custody of the Marshals pending trial in this matter.

IT IS SO ORDERED.

Dated: July 24, 2025

KANDIS A. WESTMORE
United States Magistrate Judge