UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NOAH KANAYE BAUER,<br><br>　　　　　Defendant. | Case No.　25-cr-00079-AMO-1<br><br><br>**ORDER RE DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 22 |

　　　　This is a criminal case involving charges of possession of a 3D-printed machinegun conversion device.  Defendant Noah Kanaye Bauer's motions to dismiss and motion to suppress were heard before this Court on July 14, 2025.  This Order considers only the motion to suppress; the Court considers the motion to dismiss in a separate order also issued this day.  Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS in part and DENIES in part** Bauer's motion to suppress for the following reasons.

## I.　　BACKGROUND

### A.　　September 6, 2024 Stop and Arrest

　　　　On September 6, 2024, at approximately 4:16 pm, the Brentwood Police Department ("BPD") 911 emergency line received two calls regarding someone with a gun at the Raley's supermarket.  Both calls were recorded.

　　　　In the first call, someone reported that he was calling from the Raley's in Brentwood and that one of his managers had seen "a couple of guys in the aisle" with a gun.  *See* Kane Decl., Ex. 1.  The 911 operator asked to speak to the employee who had seen the two individuals with the gun.  *Id.*  The second speaker reported that he saw a gun "for sure," that they had it "in their

1    hands," and that "he was cocking it." *Id.* The speaker reported that the handgun was black or dark

2    grey and the two men were in aisle six of the store. *Id.* The speaker reported that the two men did

3    not appear as if they were going to use the weapon or threaten anybody, but one of them had

4    pulled back the slide a couple of times, possibly to see if it was jammed. *Id.* The second speaker

5    described the person with the gun as white, early twenties, approximately six feet tall, with a thin

6    build, potentially wearing a blue shirt. *Id.* The speaker gave his name as "Andrew" and provided

7    a callback number. *Id.*

8        In the second 911 call, an individual reported that his wife was at the Raley's grocery store

9    and that there were "two guys" inside with a gun. *See* Kane Decl., Ex. 2. The caller reported that

10   his wife had seen the gun and that one of the individuals "racked the slide back." *Id.* The caller

11   relayed the description from his wife as he spoke with her on another line. *Id.* She described two

12   white guys, lean build, early twenties. *Id.* The caller relayed that they were last seen on aisle six

13   and that she had reported what she observed to the employees at the store. *Id.* The caller also

14   reported that he was an Oakley police officer and gave a callback number. *Id.*

15       BPD 911 dispatch immediately relayed a message regarding the calls to Brentwood Police

16   Officers Esperanza Rojas and Jason Fish. *See* Kane Decl., Ex. 3 (BPD 911 Dispatch

17   Communication); Rojas Decl. ¶ 3; Fish Decl. ¶ 3. Officer Rojas was finishing a traffic stop across

18   the street from the Raley's store, so she arrived at the store almost immediately following the call.

19   Rojas Decl. ¶ 3. Officer Fish arrived just after her. Fish Decl. ¶ 3. At the front of the store,

20   Officers Rojas and Fish encountered a Raley's employee wearing a name tag with the name

21   "Noe," who reported that "they" were not being threatening but that a "couple" of customers and

22   employees had seen them and that they were feeling "uneasy." Rojas Decl. ¶ 4; Fish Decl. ¶ 4.

23   Noe also said that they could "see it through the shirt," that "they were on aisle 5," and "one of

24   them was wearing a blue shirt." *Id.*

25       Officers Rojas and Fish then entered the Raley's store, with their weapons holstered, and

26   they walked toward aisle five to look for the two individuals with the firearm. Rojas Decl. ¶ 6;

27   Fish Decl. ¶ 6. Both officers knew that it was a violation of California law to carry a concealed

28   weapon without a permit. *Id.* When Officers Rojas and Fish turned down aisle five, they could

United States District Court
Northern District of California

2

see two white men at the end of the aisle who matched the descriptions they had been given, including the blue shirt. Rojas Decl. ¶ 7; Fish Decl. ¶ 7. Officer Fish saw the grip portion of a handgun protruding from the front waistband of one of the men. Fish Decl. ¶ 7. When the person with the gun saw the officers, he lifted his shirt and put it in front of the gun to conceal it and walked with the other man a few steps away from the officers, then both turned and were out of sight for a moment. *Id.* Both officers began running toward the two men, and Officer Fish drew his firearm. Rojas Decl. ¶ 8; Fish Decl. ¶ 8. When the two officers rounded the far corner of aisle five, the two men were standing in the open corridor between aisles that ran down the middle of the store. *Id.* When Officer Fish reached the man he had seen with the gun, he pointed his firearm at him and ordered him to put his hands on his head. Fish Decl. ¶ 8. Officer Fish handcuffed him, lifted his shirt, and removed the handgun, which was still in his waistband where Officer Fish had seen it. *Id.* Officer Rojas ran to the other individual, who she later learned was Caleb Bauer, and ordered him to put his hands on his head. Rojas Decl. ¶ 8. Officer Rojas observed Officer Fish pull a gun from Noah Bauer's waistband. *See* Rojas Decl. ¶ 8; Ex. 4 at 1:20-2:20; Ex. 5 at 00:26-1:26.

The officers began walking both individuals out of the store. *See* Rojas Decl. ¶ 9; Fish Decl. ¶¶ 9-12; Ex. 4 at 2:20-2:50; Ex. 5 at 1:22-2:05. Officer Fish led the man who had possessed the firearm and who they later learned was Noah Bauer, while Officer Rojas led Caleb Bauer, who they later learned was his brother. *Id.* Officer Fish paused to check the firearm he had removed from Noah Bauer's waistband. Fish Decl. ¶ 10. He could see and feel that the frame felt light, as if it were made of plastic. *Id.* Officer Fish removed the magazine, which appeared to be an authentic Glock-style magazine, and he also racked back the slide, which appeared to be made of metal and felt more substantial. *Id.* Neither the chamber nor the magazine contained any ammunition. *Id.* As they were walking out of the store, one of the individuals asked what they were "being arrested for." Officer Fish told them that they were being detained. Fish Decl. ¶ 11.

When they reached a BPD police vehicle, Officer Fish patted down Bauer[1] to check for any additional weapons, ammunition, or other dangerous items.  Fish Decl. ¶ 12; Ex. 5 at 2:40-3:45.  He found Bauer's wallet with identification.  *Id.*  Officer Fish asked Bauer to have a seat in the car.  Fish Decl. ¶ 13.  He further examined the seized firearm and observed that it had no serial number and appeared to be constructed from a printed plastic polymer "lower."  *Id.*  Officer Fish knew that it was a violation of California law to possess an unserialized firearm.  *Id.*

While Bauer was seated in the vehicle, still outside the grocery store, Officer Fish used his BPD-issued *Miranda* card to read Bauer his rights.  Fish Decl. ¶ 14; *see also* Ex. 5 at 6:20-8:10.  After he read each right, he asked Bauer if he understood, and Bauer nodded his head.  *Id.*  At one point Officer Fish said to him "you're nodding your head yes" and Bauer did not respond.  *Id.*  After reading Bauer his rights, Officer Fish informed him that he was in the car, detained, because he had a gun in his waistband while walking around.  Fish Decl. ¶ 15.  When asked whose gun it was, Bauer did not respond.  *Id.*  Officer Fish informed him again that he did not have to talk if he did not want to, but that it was his time to tell his side of the story.  *Id.*  Again, Bauer did not respond.  *Id.*  Officer Fish asked, "do you not want to talk?" and Bauer shook his head without looking at Officer Fish.  *Id.*  Officer Fish informed Bauer that he was under arrest because it is illegal in the state of California to have a firearm without a serial number on it.  *Id.*

Meanwhile, while Caleb Bauer was seated in her BPD vehicle, Officer Rojas used her BPD-issued *Miranda* card to read him his rights.  Rojas Decl. ¶ 9; *see also* Ex. 4 at 7:15-15:16.  After she read each right, she asked Caleb Bauer him if he understood, and he answered "yes."  *Id.*  After she read his rights, she asked if he wanted to speak to her and he said "sure."  *Id.*  Caleb Bauer told her that his brother took the gun out while they were in the store to "show it" to him.  *Id.* ¶ 10.  He further said that his brother was explaining how the gun works.  *Id.*  Caleb Bauer added that, "it's not a real gun," but then said, "I take it back," and said that Bauer told him that it can "work as a real gun" but that it did not have any ammunition in it.  *Id.*  Caleb Bauer told her that Bauer 3D-printed the gun at home.  *Id.*

---

[1] All further references to "Bauer" are to Noah Bauer unless otherwise stated.

United States District Court
Northern District of California

**B.      Interviews at Brentwood Police Department Station**

After Noah and Caleb Bauer were transported to the BPD station, Detectives Goold and Kathain interviewed Caleb Bauer.  *See* Ex. 6 (Caleb Bauer Interview Video); Goold Decl. ¶ 4; Kathain Decl. ¶ 4.  The interview began at approximately 6:32 p.m.  *Id.*  Detective Goold read Caleb Bauer his *Miranda* rights.  Goold Decl. ¶ 4.  Caleb Bauer told the detectives that, while he and his brother were in an aisle of the grocery store, his brother pulled out his gun.  *Id.*  He said that his brother was explaining to him how the gun works and how to use it, including how to load it and reload it.  *Id.*  He confirmed that Bauer had a 3D printer in his bedroom and had printed the seized firearm.  *Id.*  He also said that his brother does not believe that it should be illegal to carry a firearm in public.  *Id.*

Detectives Goold and Kathain then interviewed Bauer.  The interview began at approximately 7:18 p.m.  *See* Ex. 7 (Noah Bauer Interview Video) at 1:20-15:35; Goold Decl. ¶ 5; Kathain Decl. ¶ 5.  Detective Goold began the interview by reading Bauer his *Miranda* rights.  *Id.*  Detective Goold informed Bauer that it was illegal to carry a firearm, even an unloaded one, in public in California.  *Id.*  Bauer walked the detectives through what happened, noting that the gun he possessed was a "Glock 19" that he had carried the gun in public before.  *Id.*  Bauer reported that he had printed the receiver portion of the firearm and that he had obtained the other parts online.  *Id.*  He also told the detectives that he had obtained the files to make the frame of the firearm online.  *Id.*  Bauer also discussed the content he views online.  *Id.*

Detective Goold told Bauer that the BPD wanted to be able to report that he was not assembling weapons to "sell to the cartel," or anything similar.  *See* Ex. 7 at 18:10-23:00; Goold Decl. ¶ 6; Kathain Decl. ¶¶ 6-7.  Detective Goold explained that he could obtain a search warrant, but that he was "optimistic" that Noah would be willing to walk them through his home to show the detectives the 3D printer, the other frames he had printed, the packaging from the "rails" he purchased, and show that he did not have any other parts or equipment for manufacturing firearms. *Id.*  Detective Goold asked if Bauer would be willing to participate in such a walk through, and Bauer responded, "yes."  *Id.*  Detective Goold explained that they would give him a consent to search form to sign and that it would mean that he was giving consent for the police walk into his

5

United States District Court
Northern District of California

room with him. *Id.* Detective Goold further explained that this would be a search, that the Constitution "protects us as Americans," and that the police would not go into Bauer's house unless he invited them in. *Id.* Detective Goold explained that they would ask Bauer to show them that he did not have a hidden cache of weapons or ammunition, and that the police would look under his bed and "poke around" so that when they wrote their report, they could confirm that he was not a "school shooter," a "terrorist," or an extremist planning violence. *Id.* Detective Goold asked if that sounded fair and Noah again said "yes." *Id.* Detective Goold explained that the consent form was for Noah's residence, but just for his bedroom and that they would not be searching his "parents' room or anything like that." *Id.* Detective Goold presented Bauer a BPD consent to search form with his address that Detective Kathain had prepared. *Id.* Detective Goold asked Bauer to look over the form and see if it was something he could agree to. *Id.* They told Bauer that the police would give him and his brother a ride back to their home. *Id.* Bauer signed the form after reviewing it. *See* Kane Decl., Ex. 15 (signed BPD consent form). At no point during the interview did Bauer say or indicate that he did not want to speak further. Goold Decl. ¶ 7. He responded to all of the questions the BPD asked. *Id.*

### C.    Search of Bauer's Home

At approximately 8:14 p.m., Detective Goold, Detective Kathain, Detective Bascom, and Officer Rojas arrived and began a warrantless search of Bauer's home. *See* Goold Decl. ¶ 8; Kane Decl., Ex. 8 (Goold Search BWC) at 00:00-1:55; Ex. 9 (Kathain Search BWC) at 00:00-1:25; Ex. 10 (Rojas Search BWC) at 00:00-2:30; Ex. 11 (Bascom Search BWC) at 00:00-1:50. Bauer opened the front door of the home and led them inside. *Id.* Once inside, Detective Bascom recounted the events from the grocery store to Bauer's mother then said that Bauer had admitted to printing firearms with his 3D printer and that he had agreed to walk them through his room, show them what he's doing, and for them to make sure that "he's not doing anything crazy." *Id.* Bauer's mother nodded in response and said "okay," and then led the police to Bauer's bedroom and turned on the light. *Id.* Bauer was behind her. She then moved out of the room into the hallway. *Id.* Immediately upon entering the bedroom, Detective Goold saw three 3D-printed handgun "receivers" or "frames" on the bed. *Id.*; Goold Decl. ¶ 9.

As BPD searched the room, Bauer stood in the hallway and observed.  Goold Decl. ¶¶ 10-12; Kane Decl., Ex. 8 at 3:20-8:10.  Detective Goold asked Bauer about the boxes that the rails or magazines he ordered came in.  *Id.*  Bauer said they came in Amazon packaging and that he threw it out.  *Id.*  When Detective Goold asked him to confirm that he ordered the rails on Amazon, Bauer said "yeah."  *Id.*  Detective Goold saw the 3D printer next to Bauer's bed and stated that he would like to look at the 3D printer and turn it on.  *Id.*  Bauer did not object.  *Id.*  When Detective Goold looked at the screen of the 3D printer he saw at least two files that he recognized as related to machine gun conversion devices with the words "sear tip" and "sear body."  *Id.*  He also saw files with names that he included "19," which he recognized as a reference to the Glock 19 frame. *Id.*  While searching Bauer's bedroom Detective Goold found a laptop computer and asked Bauer to show him his Telegram channels on the laptop.  Bauer said that he accessed Telegram on his phone or on his "Windows PC."  *Id.*  Detective Goold said they could go to the PC "if that works." *Id.*  Bauer gestured out of the room, then he led Detective Goold from his bedroom through the house into a common area near the kitchen and living room where a desktop computer was sitting on a desk (the "PC").  *Id.*

Bauer started the computer and sat at the desk.  Goold Decl. ¶¶ 13-14; Ex. 8 at 8:10-17:40. He opened the Telegram application and began showing Detective Goold his Telegram channels. *Id.*  Detective Goold asked him to scroll through and show specific channels, and Bauer manipulated the mouse to do so.  *Id.*  They discussed some of the content available on Telegram, including neo-Nazi and other extremist content.  *Id.*  At one point, after Bauer had sat back in his chair, Detective Goold asked Bauer if he could scroll himself.  *Id.*  Without objection or movement from Bauer, Detective Goold began using the mouse.  *Id.*  When Detective Goold asked about the content of a particular Telegram channel, Bauer said, "I can show you," and then resumed use of the mouse himself.  *Id.*  Detective Goold asked defendant about the 3D printing program he uses and his "STLs," which are files used in connection with 3D printing.  *Id.*  Bauer said the program was "Cura" and opened the program on the computer.  *Id.*  Detective Goold asked Bauer if he could use the mouse and indicated toward the mouse.  *Id.*  Bauer again let Detective Goold use the mouse to navigate to the Cura recent files list without objection.  *Id.*  He

saw that the list contained two files with identical or very similar names to the file names related to auto sears that he had seen on the 3D printer. *Id.* When Detective Goold opened one file, he recognized the image as a machine gun conversion device or "auto sear." *Id.* Detective Goold asked Bauer to tell him what the object on the screen was used for, and Bauer responded, "to make it shoot faster." *Id.* Detective Goold said "fully automatic, right?" and Bauer said "yeah." *Id.* Bauer did not react when Detective Goold asked, "so you're trying to manufacture fully automatic pistols?" *Id.* Detective Goold then told Bauer that it was "a solid felony." *Id.* He asked Bauer if he printed any of them, and Bauer reported that he printed one. *Id.* Detective Goold asked where it was, and Bauer said it was in his room. *Id.* When Detective Goold asked Bauer to show him where, Bauer stood from the desk and led Detective Goold back to his room. *Id.*

They returned to his room, where Bauer searched for and found one piece of the auto sear. Goold Decl. ¶ 16; Kane Decl., Ex. 8 at 17:40-18:15. Detective Goold asked if he had the other piece, and he found it nearby. *Id.* Detective Goold recognized the items as the two pieces of a machine gun conversion device or auto sear. *Id.*

Detective Goold showed Bauer's parents Bauer's online activity and explained to them that Bauer had been viewing pro-Nazi, Holocaust denial, and antisemitic content. Goold Decl. ¶ 17; Ex. 8 at 27:35-39:50. He also showed them the 3D printing program on the computer, including the auto sear. *Id.*

When BPD were finished searching, they seized the 3D printed auto sear, handgun frames, and the 3D printer. Goold Decl. ¶ 18.

**D.    Search & Seizure Pursuant to March 5 Warrant**

On March 3, 2025, Chief Magistrate Judge Donna M. Ryu signed a search warrant authorizing the search of Noah Bauer's home for evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(o) (Possession of a machinegun) and 26 U.S.C. § 5861(d) (Unlawful possession of an unregistered firearm). Kane Decl., Ex. 16 ("March 3 warrant"). Attachment B to the warrant authorized the seizure of "[c]omputers or storage media used as a means to commit the violations described above, including any computers or storage media in BAUER's room, on his person, or located in the SUBJECT PREMISES and accessible to BAUER

such that they reasonably could have been used to commit the violations described above, including but not limited to BAUER's Windows PC and cellular telephone." *Id.*

On March 5, 2025, FBI agents executed the warrant. Furtado Decl. ¶¶ 4-7; Minor Decl. ¶¶ 5-6. When FBI agents examined a Black Fracta Computer Tower (the "PC") that was located in the common area of the house, it was powered on, with an open browser showing ChatGPT. *Id.* The agents observed ChatGPT conversations about, among other things, machinegun conversion devices known as "auto sears" or "Glock switches." Kane Decl., Ex. 17 (Furtado Aff. ¶ 20). The FBI seized the Windows PC in order to make a forensic image of the device. It was the only item seized pursuant to the warrant. Furtado Decl. ¶ 6. Bauer did not make any statements during the search. *Id.* ¶ 7. On March 5, 2025, an FBI special agent began the process of creating a forensic image of the PC. Minor Decl. ¶¶ 6-7.

### E.    Search & Seizure Pursuant to March 10 Warrant

On March 10, 2025, U.S. Magistrate Judge Robert M. Illman signed an additional "rollover" warrant to search the Windows PC already in FBI possession. Kane Decl., Ex. 18 ("March 10 warrants"). This warrant differed from the previous warrant because it authorized a search for evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C. § 249(a)(1) (Hate Crime Acts), in addition to Title 18 U.S.C. § 922(o) (Possession of a machinegun), and Title 26 U.S.C. § 5861(d) (Unlawful possession of an unregistered firearm).[2] *Id.* FBI Special Agent Katelynn Furtado's review of the image of that device is ongoing. Furtado Decl. ¶ 11.

Also on March 10, 2025, Magistrate Judge Illman signed a search warrant authorizing the search of Noah Bauer's home and mobile device for evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C. §§ 249(a)(1) (Hate Crime Acts), 922(o) (Possession of a machinegun), and 26 U.S.C. § 5861(d) (Unlawful possession of an unregistered

---

[2] The additional statute, Section 249(a), "Offenses involving actual or perceived race, color, religion, or national origin," makes it a crime to willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, [or] attempt[] to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1).

firearm). Kane Decl., Ex. 17. In addition, Judge Illman signed a Complaint and Arrest Warrant for Noah Bauer charging a violation of Title 18 U.S.C. § 922(o). Dkt. No. 1. On March 11, 2025, FBI agents executed the search and arrest warrants. Minor Decl. ¶ 8; Furtado Decl. ¶ 8. The FBI took Bauer into custody. Furtado Decl. ¶ 8. The FBI agent who handcuffed Bauer patted him down during the arrest and found the mobile phone subject to the warrant in Bauer's pocket. *Id.* ¶ 9. FBI agents seized the mobile phone in order to conduct a forensic data extraction of the device. Minor Decl. ¶ 8. FBI Special Agent Stephanie Minor asked defendant his mobile phone passcode, which he gave. *Id.* The mobile phone was the only item seized pursuant to the warrant. On the same day , Special Agent Minor connected Bauer's mobile phone to a forensic access tool in order to extract the data on his phone. Minor Decl. ¶11; Ex. 13 at 4:30-end; Ex. 14 at 4:25-7:05. Special Agent Furtado reviewed the phone data and documented those results. Furtado Decl. ¶ 10.

Both of the March 10, 2025 affidavits detailed similar probable cause as the March 3 warrant regarding defendant's manufacture of a firearm and machinegun conversion device. Kane Decl., Ex. 17 (Furtado Aff. ¶¶ 20-23); Ex. 18 (Furtado Aff. ¶¶ 20-23). The affidavits provided additional evidence establishing probable cause as to Section 249(a)(1) that the FBI had seen during its seizure of the PC at the March 5, 2025 execution of the March 3 warrant, including ChatGPT conversations in which a user inquired about the capabilities of various firearms, which firearms worked with auto sears, mass shootings, where Jews live, and which firearms can penetrate body armor. *See id.*, Ex. 17 (Furtado Aff. ¶ 22). Special Agent Furtado also included information interpreting some of the terms defendant used in his ChatGPT questions, such as that a "Choosy Express" is a term used to refer to illegal or improvised devices that convert a semiautomatic firearm into fully automatic. *See, e.g.*, Ex. 18 ¶ 21. Both warrants also included additional categories of records in Attachment B specifically tied to the statutory violations, including "all records related to machinegun conversion devices" and "all records related to hate crimes or other violent attacks on any individuals based on their actual or perceived race, color, religions, or national origin . . . including persons who are actually or perceived to be Jewish." Ex. 18, Att. B ¶¶ 3, 7.

## II.    DISCUSSION

Bauer moves to suppress evidence gathered by BPD and the FBI on the basis that law enforcement violated his constitutional rights.  After setting forth the relevant legal standards for suppression, the Court considers the asserted constitutional violations in mostly chronological order to determine after what point the Government's evidence must face suppression.

### A.    Legal Standards

Under the exclusionary rule, a criminal defendant may move to suppress evidence obtained in violation of the Fourth Amendment or Fifth Amendment.  *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014); Fed. R. Crim. P. 41(h); *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).  The exclusionary rule covers not just evidence obtained as a direct result of a constitutional violation, but also evidence derived from that illegality, the so-called "fruit of the poisonous tree."  *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).  When deciding a motion to suppress, courts first determine whether a constitutional violation occurred, and then, whether suppression is appropriate.  *Davis v. United States*, 564 U.S. 229, 236-39 (2011); *see also Herring v. United States*, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies.").

### 1.    Fourth Amendment – Search and Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  The "basic purpose of this Amendment" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Municipal Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967)).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' "  *Lange v. California*, 594 U.S. 295, 301 (2021) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  The reasonableness of a particular search or seizure depends upon whether, objectively, the challenged

United States District Court
Northern District of California

1   action was justified under the totality of the circumstances.  *Ashcroft v. al-Kidd*, 563 U.S. 731,

2   735-36 (2011); *Samson v. California*, 547 U.S. 843, 848 (2006).

3   A "search" occurs within the meaning of the Fourth Amendment when the government

4   invades a place in which a person has a reasonable expectation of privacy.  *Olson v. Cnty. of*

5   *Grant*, 127 F.4th 1193, 1198 (9th Cir. 2025) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

6   Warrantless searches and seizures violate the Fourth Amendment unless they fall within one of a

7   "few specifically established and well-delineated exceptions."  *City of L.A., Calif. v. Patel*, 576

8   U.S. 409, 419 (2015) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "Because

9   warrantless searches and seizures are per se unreasonable, the government bears the burden of

10  showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's

11  warrant requirement."  *United States v. Steinman*, 130 F.4th 693, 711 (9th Cir. 2025) (quoting

12  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)).

### 2.   Fifth Amendment – *Miranda* Protections

14  The Fifth Amendment to the Constitution states that no person "shall be compelled in any

15  criminal case to be a witness against himself."  U.S. Const. amend. V.  To enforce and as part of

16  this constitutional privilege, the Supreme Court has long required police to advise people of their

17  rights before custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  Prior to a

18  custodial interrogation, law enforcement must advise the accused that "he has the right to remain

19  silent, that any statement he does make may be used as evidence against him, and that he has a

20  right to the presence of an attorney."  *Id.* at 444.  "*Miranda* conditioned the admissibility at trial of

21  any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings

22  and obtain a waiver of rights before custodial questioning generally requires exclusion of any

23  statements obtained."  *Seibert*, 542 U.S. at 608.  A defendant may waive their *Miranda* rights and

24  agree to speak with law enforcement if the waiver is knowing and voluntary.  *See Berghuis v.*

25  *Thompkins*, 560 U.S. 370, 382-83 (2010).

### B.   Initial Stop – Grocery Store

27  Bauer argues that BPD violated the Fourth Amendment when Officers Fish and Rojas

28  seized him without a warrant at the grocery store on September 6, 2024.  "Under the Fourth

*United States District Court*
*Northern District of California*

12

Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). "Probable cause justifying a warrantless arrest exists where, 'under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime.' " *United States v. Hamilton*, 131 F.4th 1087, 1094 (9th Cir. 2025) (quoting *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010)) (alteration omitted). To establish probable cause to arrest, the Government must show that, at the moment of the arrest, "the facts and circumstances within [the officers'] knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that [the one arrested] had committed or was committing an offense." *United States v. Willy*, 40 F.4th 1074, 1080 (9th Cir. 2022) (internal quotation marks omitted). Probable cause "is not a high bar" – it "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (alterations, internal quotation marks, and citations omitted). The Government bears the burden of showing probable cause for a warrantless arrest. *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). If the Government fails to meet this burden, evidence seized incident to the unlawful arrest is excludable. *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996).

As noted above, Bauer argues that the initial stop and detention in the grocery store on September 6, 2024, constituted a warrantless seizure that violated the Fourth Amendment and requires suppression of all fruits of that seizure. *See* Mot. at 10; Reply at 1-5. The Government responds that the Officers Fish and Rojas had probable cause to conduct a warrantless arrest of Bauer based on the information relayed to them from the 911 calls, the information provided in person when they arrived at the grocery store, and their observations of Bauer. *See* Opp. at 11-12. The Government alternatively argues that BPD Officers Fish and Rojas held reasonable suspicion to conduct an investigatory or *Terry* stop of Bauer and his brother in the grocery store based on the facts and circumstances known to them at the time. *See* Opp. at 12-15 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

United States District Court
Northern District of California

1      Here, the Court need not address whether Officers Fish and Rojas held a reasonable

2  suspicion to conduct a *Terry* stop because the Officers had probable cause to arrest at the time they

3  stopped Bauer in the grocery store.  Upon entering the grocery store based on multiple tips

4  regarding two men possessing a gun, Officer Fish describes,

> When Officer Rojas and I turned down aisle 5, I could see two white
> males at the end of the aisle.  The two males matched the description
> I had been given.  I could see the grip portion of a handgun
> protruding from the front waistband of one of the males.  When he
> saw us, he lifted his shirt and put it in front of the gun to conceal it,
> and walked a few steps away from us, then turned and was out of
> sight for a moment.

9  Fish Decl. ¶ 7; *see also* Fryzek Decl., Ex. A (Bauer -001185) (Fish Misdemeanor Report dated

10  9/6/2024).  Officer Fish's observation of the grip portion of the gun protruding from Bauer's

11  waistband followed by Bauer's action to conceal the gun suffices to establish probable cause in

12  support of arrest because carrying a concealed handgun violates California's gun laws.  *See United*

13  *States v. Vandergroen*, 964 F.3d 876, 881 (9th Cir. 2020) (citing Cal. Pen. Code § 25400).

14  Despite Bauer's contention of implausibility, Reply at 4, the Court gives due credit to Officer

15  Fish's sworn testimony that he saw the gun, particularly where there is no countervailing

16  evidence.  *See United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017) (giving "significant weight

17  to an officer's observation of a visible bulge in an individual's clothing that could indicate the

18  presence of a weapon" justifying stop under lesser "reasonable suspicion" standard).  Officer

19  Fish's observation of such illegal and potentially dangerous activity merited "immediate detention

20  of [the] suspect" to mitigate any threat to public safety.  *Vandergroen*, 964 F.3d at 881 (quoting

21  *United States v. Grigg*, 498 F.3d 1070, 1080 (9th Cir. 2007)).

22      Further, under the "search incident to arrest" exception to the Fourth Amendment, officers

23  making a lawful arrest can conduct a search of both the suspect's person, *United States v.*

24  *Robinson*, 414 U.S. 218, 235 (1973), and the area within the arrestee's "immediate control,"

25  *United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014).  Officer Fish searched Bauer incident

26  to and contemporaneous with a lawful arrest.  *See* Fish Decl. ¶ 8 ("I handcuffed him, lifted his

27  shirt, and removed the handgun, which was still in his waistband where I had seen it."); Rojas

28  Decl. ¶ 8 ("I saw Officer Fish pull a gun from Noah Bauer's waistband.").  Therefore, the

14

1    detention and search of Bauer in the grocery store was permissible under the Fourth Amendment,

2    and the evidence garnered as a result need not face suppression.

3        **C.    Interrogations**

4        Bauer moves to suppress any statements he made to law enforcement prior to being given

5    his *Miranda* warnings.  At the outset, the Government represents that it "does not intend to use

6    any statements by defendant prior to Officer Fish's reading of the *Miranda* warnings in its case-in-

7    chief," rendering this portion of Bauer's motion moot.  Opp. at 15.  The Court accepts this

8    representation and will accordingly preclude any effort by the Government to introduce Bauer's

9    pre-*Miranda* statements in its case-in-chief.

10       In separate arguments, Bauer challenges two interrogations by BPD following his arrest

11   and *Miranda* warnings: the interrogation at the BPD station following his arrest and the

12   interrogation during the search of his home.  Though the Court's discussion of Bauer's challenges

13   largely proceeds chronologically in this Order, the Court takes up the interrogation at Bauer's

14   home in this section for purposes of addressing the *Miranda*-based challenges together.

15           **1.    Interrogation at Station**

16       Bauer challenges BPD's interrogation at the police station on two grounds: (a) BPD did

17   not "scrupulously honor" Bauer's invocation of his right to remain silent when he was arrested at

18   the grocery store, and (b) Bauer did not voluntarily waive his right to remain silent.  The Court

19   addresses these two arguments in turn.

20           **a.    Bauer's Invocation**

21       The Government initially argues that there existed no need to scrupulously honor Bauer's

22   invocation of his right to remain silent because his invocation, a headshake in response to the

23   question Officer Fish's query, "do you not want to talk," was ambiguous.  Not so.  As Officer

24   Fish's body camera showed, Kane Decl., Ex. 5, and he explained in his declaration, Bauer

25   "nodded his head" repeatedly to indicate he understood his rights, remained silent in response to

26   the officer's questions and then "shook his head" when the officer asked, "'do you not want to

27   talk.' "  Fish Decl. ¶¶ 14-15.  The officer reasonably understood Bauer's head shake to mean "no."

28   Kane Decl., Ex. A, Bates 1185.  By nodding his head to indicate understanding, remaining silent

United States District Court
Northern District of California

1    in response to questioning, and then shaking his head when asked if he wanted to talk, Bauer

2    unambiguously invoked his Fifth Amendment privilege.  *See Miranda*, 384 U.S. at 473-74 ("If the

3    individual indicates in any manner, at any time prior to or during the questioning, that he wishes to

4    remain silent, the interrogation must cease.").

5                            **b.      Voluntary Waiver**

6            The Government alternatively argues that Bauer, after having invoked his right to remain

7    silent in response to Officer Fish's *Miranda* warnings, voluntarily waived that right following

8    another set of *Miranda* warnings at the BPD station.  Bauer contends that BPD failed to

9    scrupulously honor his invocation of his rights and that any statements made at the BPD station to

10   be suppressed.

11           It is permissible for police to resume questioning in certain circumstances after an

12   invocation of the right to remain silent.  The Supreme Court has "rejected the proposition that its

13   earlier decision in *Miranda* barred law enforcement officials from ever questioning a suspect after

14   the suspect had invoked his right to remain silent," in favor of a case-by-case inquiry into all the

15   relevant facts to determine whether the suspect's rights have been respected.  *United States v. Hsu*,

16   852 F.2d 407, 409-10 (9th Cir. 1988).  In *Michigan v. Mosley*, the Supreme Court imposed a

17   totality of the circumstances standard to assess whether interrogations following an initial

18   invocation of the right to remain silent violated the accused's rights, requiring review of factors

19   such as (1) whether a significant amount of time elapsed between the defendant's invocation of the

20   right to remain silent and further questions; (2) whether the same officer conducted the

21   interrogation where the defendant invoked the right to remain silent and the subsequent

22   interrogation; (3) whether the defendant was given a fresh set of *Miranda* warnings before the

23   subsequent interrogation; and (4) whether the subsequent interrogation concerned the same crime

24   as the interrogation previously cut off by the defendant. *See Michigan v. Mosley*, 423 U.S. 96,

25   104-06 (1975).  The Supreme Court, considering the totality of circumstances, held that the

26   admission of an incriminating statement made after the defendant initially refused to answer

27   questions did not violate *Miranda* where the police gave full *Miranda* warnings to the defendant at

28   the very outset of each interrogation, subjected him to only a brief period of initial questioning,

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    and suspended questioning entirely for a significant period – two hours –  before beginning a

2    subsequent interrogation that led to the incriminating statement.  *Mosley*, 423 U.S. at 97-98.

3    Following *Mosley*, the Ninth Circuit held in *Hsu* that a defendant's right to cut off questioning was

4    scrupulously honored where the defendant asserted their right to remain silent during an initial

5    interrogation, then answered questions during a second interrogation after a second, fresh

6    provision of *Miranda* warnings.  *Hsu*, 852 F.2d at 411-12.  The court reasoned that neither the

7    amount of elapsed time between interrogations, which was about 30 minutes, nor that the suspect

8    was interrogated about the same subject matter, were of primary importance in determining

9    whether a suspect's rights were "scrupulously honored" under *Mosley*.  *Hsu*, 852 F.2d at 410.

10   Rather, *Hsu* clarified that the *Mosley* factors are not exhaustive and, focusing on the validity of the

11   second waiver, found "fresh warnings" to be the "most important factor" to readvise the suspect of

12   his *Miranda* rights, in addition to consideration of "the actual coercion exerted by police upon a

13   suspect in order to extract information."  *Id.* at 410, 411.  Since *Hsu*, the Ninth Circuit has not

14   established a per se rule requiring a suspect be readvised of their rights after the passage of time or

15   changed circumstances.  *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1130 (9th Cir.),

16   amended, 416 F.3d 939 (9th Cir. 2005) (holding that statements made on the second day of

17   questioning, 16 hours after original *Miranda* warnings, were sufficiently close in time that no

18   readvisement was required).

19            Here, Bauer nodded his head to confirm that he understood his *Miranda* rights as read by

20   Detective Fish, and then he remained silent in conformity with those rights, further demonstrating

21   that he understood his right to remain silent.  Fish Decl. ¶ 14.  Indeed, Bauer made clear that he

22   intended to remain silent by shaking his head in the negative in response to Officer Fish's query,

23   "do you not want to talk?"  Fish Decl. ¶¶ 14-15.  Officer Fish cut off questioning after Bauer's

24   head shake in the car.  Fish Decl. ¶ 15; Kane Decl., Ex. 5 at 2:40-3:45.  Approximately two hours

25   later, Detective Goold then re-advised Bauer of his rights before interviewing him at the station in

26   the detectives' interview room.  Kane Decl., Ex. 7 at 1:15-1:45; Goold Decl. ¶ 5; *cf. Mosley*, 423

27   U.S. at 98 (finding the passage of two hours between initial invocation of right to remain silent

28   and subsequent interrogation sufficient to honor accused's initial invocation).  When Detective

United States District Court
Northern District of California

1    Goold readvised Bauer of his *Miranda* rights, Bauer gave no indication that anything had changed

2    about his understanding of his rights.  The questioner was different and the subject matter

3    following the subsequent interrogation considered a slightly distinct subject matter – while Officer

4    Fish asked about the circumstances of Bauer's gun possession at the grocery store, the focus of

5    Detective Goold's BPD station interview largely centered on Bauer's 3D printing of firearms at

6    home.  Fish Decl. ¶ 15; Ex. 5 at 2:40-3:45; Goold Decl. ¶ 5; Ex. 7 at 1:15-1:45.  Though the Ninth

7    Circuit has minimized the importance of these *Mosley* factors compared to the readvisement of an

8    accused's *Miranda* rights, *Hsu*, 852 F.2d at 410-11, these factors still support a finding that BPD

9    scrupulously honored Bauer's earlier invocation of his right to remain silent and that Bauer

10   voluntarily waived that right by responding to Detective Goold's questions.

11           Bauer emphasizes that several factual considerations weigh against a knowing and

12   voluntary waiver in this case, including his "youth; his inexperience with the criminal-justice

13   system; his being under arrest; his having been held in custody for several hours; his being in an

14   interrogation room with two officers between him and the door; BPD's minimizing the conduct it

15   was investigating; and the absence of a written or verbal acknowledgement of understanding or

16   waiver of his rights."  Reply at 9.  But none of these, alone or in combination, amount to coercion

17   on the part of BPD or even an inference that the officers sought to "wear down [Bauer's]

18   resistance and make him change his mind" about remaining silent.  *See United States v. Olof*, 527

19   F.2d 752, 754 (9th Cir. 1975).  By willingly answering Detective Goold's questions following an

20   additional recitation of the *Miranda* warnings Bauer previously understood and invoked while

21   handcuffed, Bauer voluntarily waived his right to remain silent.  *See Rodriguez-Preciado*, 399

22   F.3d at 1127 ("a suspect may impliedly waive the rights by answering an officer's questions after

23   receiving *Miranda* warnings.").  Analyzing the totality of the circumstances presented here, the

24   factors indicate that Bauer understood his rights and therefore knowingly and intelligently waived

25   them at the BPD station.  *Berghuis*, 560 U.S. at 385 ("the law can presume that an individual who,

26   with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has

27   made a deliberate choice to relinquish the protection those rights afford.").  This is not a case

28   "where the police failed to honor a decision of a person in custody to cut off questioning, either by

United States District Court
Northern District of California

1  refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear

2  down his resistance and make him change his mind."  *See Mosley*, 423 U.S. at 105-06; *see also*

3  *Navarette v. Sullivan*, 762 F. App'x 379, 381 (9th Cir. 2019) (approving finding that the police

4  scrupulously honored defendant's invocation of his right to cut off questioning even where second

5  questioning began without re-reading of *Miranda* rights).  The Court therefore denies Bauer's

6  motion to suppress the statements he made to Detectives Goold and Kathain on September 6,

7  2024.

### 2.    Interrogation at Home

9      Bauer additionally challenges the propriety of the interrogation that took place during the

10  search of his home.  *See* Mot. at 15-16.  Bauer argues in significant part that such questioning

11  constituted a custodial interrogation despite the change of venue from the police station to Bauer's

12  home – the in-home interrogation was custodial because of the "police dominated atmosphere."

13  *See* Mot. at 15 (citing *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008)).  The

14  Government effectively concedes that the questioning of Bauer in his home during the search

15  remained custodial, and it argues instead that Bauer's *Miranda* waiver remained valid.  Opp. at 24.

16  The Court agrees with the Government.  As noted above, Bauer understood the *Miranda* warnings

17  as demonstrated by his affirmative answers to Officer Fish and his silence in response to further

18  questioning, *see* Fish Decl. ¶¶ 14-15, and he voluntarily waived the right to remain silent when,

19  after another set of *Miranda* warnings, he spoke with Detective Goold in the BPD station, *see*

20  Goold Decl. ¶ 5.  The second advisement by Detective Goold and Bauer's responses to

21  questioning took place at approximately 7:15 p.m., and the search of Bauer's home, along with

22  associated interrogation, began at approximately 8:15 p.m., about an hour later.  There was no

23  need for BPD to re-issue the *Miranda* warnings given this brief intervening period.  *Cf. Rodriguez-*

24  *Preciado*, 399 F.3d at 1127 (holding that officers did not need to readminister *Miranda* warnings

25  when questioning a defendant in jail, after he was originally advised of his *Miranda* rights when

26  he was arrested the day before in a different locale).  Bauer's *Miranda* waiver remained valid for

27  the interrogation and statements made during the search of his house, and the Court accordingly

28  denies his motion to suppress any statements he made at home.

United States District Court
Northern District of California

### D.      Brentwood Police Consent Searches

Bauer seeks suppression of the evidence gathered as part of the September 6, 2024 search by BPD on two grounds: (1) Bauer's consent for the search of his home was not voluntary and (2) if the Court finds the consent voluntary, BPD's searches exceeded the scope of that consent. The Court addresses these two arguments in turn.

#### 1.      Voluntariness

Bauer challenges BPD's warrantless search of his home on the basis that the Government fails to establish his signed consent for the search of his home was voluntary. *See* Reply at 9-11; *see also* Kane Decl., Ex. 15. "It is well settled that 'a search conducted pursuant to a valid consent is constitutionally permissible.' " *Patayan Soriano*, 361 F.3d at 501 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). The Ninth Circuit identified five factors for courts to consider in determining the voluntariness of consent:

> (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.

*United States v. Brown*, 563 F.3d 410, 414-15 (9th Cir. 2009) (alterations in original; citations omitted). These factors are merely "guideposts," not a "mechanized formula" to resolve the issue of voluntariness. *Id.*; *see also Rodriguez-Preciado*, 399 F.3d at 1126 (noting that "[i]t is not necessary to check off all five factors" when analyzing the voluntariness of consent) (citing *Patayan Soriano*, 361 F.3d at 502). Rather, whether consent was voluntary must "be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "A suspect may 'unequivocal[ly] and specific[ally]' consent by giving express permission, or consent can be inferred from conduct, such as a head nod." *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023), cert. denied, 144 S. Ct. 828 (2024) (quoting *United States v. Basher*, 629 F.3d 1161, 1167-68 (9th Cir. 2011)).

The parties argue most vigorously over the fifth *Brown* factor – whether BPD's disclosure that a search warrant could be obtained constituted a threat that a search warrant would necessarily

1    result from refusal to consent.  *See* Opp at 21; Reply at 10-11.  The Government emphasizes that

2    probable cause for the warrant already existed by the time the detectives asked Bauer for consent

3    because, "when probable cause to justify a warrant exists, the weight of the fifth factor is

4    significantly diminished."  *Patayan Soriano*, 361 F.3d at 504-05; *see* Opp. at 21.  The Government

5    avers that, based on the information known to BPD at the time they suggested that they could

6    obtain a search warrant, probable cause for a warrant likely existed based on Bauer's possession of

7    the 3D-printed gun in public as well as the statements from his brother disclosing Bauer's home

8    3D-printing of weapons.  Opp. at 21; *see also* Kane Decl., Ex. 6 (Caleb Bauer Interview Video);

9    Goold Decl. ¶ 4; Kathain Decl. ¶ 4.  The Court agrees.  Because probable cause for the search

10   existed at the time BPD disclosed that a warrant could be obtained, BPD's statement to that effect

11   does not invalidate Bauer's consent to the search.  *Patayan Soriano*, 361 F.3d at 505-07.

12        The Court turns to the remaining factors to assess the voluntariness of Bauer's consent.

13   Though Bauer was in custody at the time he consented to the search of his home, the

14   circumstances of his consent show that it was informed and freely given.  The detectives in the

15   room with him at the time he executed the signed consent form wore polo shirts and their guns

16   remained in their holsters while Bauer sat unrestrained, with the door to the room open.  Kane

17   Decl., Ex. 7 at 1:20-15:35.  Bauer received two separate *Miranda* warnings prior to Detective

18   Goold's request for consent to search his home.  Fish Decl. ¶ 14; Goold Decl. ¶ 5.  By saying that

19   he "hoped" Bauer would agree to the search and asking if that was something he could agree to,

20   Detective Goold expressed that Bauer had the power to refuse.  Kane Decl., Ex. 7 at 18:10-23:00

21   (Goold: "you're giving us consent to walk into your bedroom with you . . . as Americans, we have

22   the lovely Constitution and I'm not, just like a vampire, I'm not going in your house unless you

23   invite me.").  Bauer avers that the BPD detectives raised the threat of more-serious charges if he

24   did not allow the search when they suggested that they had to look in his bedroom to verify that he

25   did not have ammunition, did not "have a hidden cache of weapons," and was "not a school

26   shooter," *id.*, Ex. 7 at 19:55-20:30, but those comments do not rise to the level of a threat within

27   context of the interrogation.  The video of the interrogation shows Bauer's consent was resolute

28   rather than hesitant; moreover, Bauer was not rushed into granting consent – he was given and

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1    took time to review the consent form before signing it.  Though Bauer avers that his consent was

2    ineffective because BPD failed to warn him that he could refuse, *see* Reply at 9-11, that purported

3    failure does not diminish the effect of his consent, particularly in light of these other circumstances

4    surrounding this consent.  *United States v. Russell*, 664 F.3d 1279, 1282 (9th Cir. 2012) ("consent

5    to a search is not necessarily involuntary simply because officers failed to provide notice of the

6    right to refuse.").  The totality of these circumstances shows that Bauer voluntarily consented to

7    the search of his home.

                         **2.    Scope of Consent**

9        Bauer argues that, even assuming he granted consent for the search of his home, BPD

10    unreasonably exceeded the scope of that consent by searching the contents of his 3D printer and

11    the PC in the living room.  Reply at 11-15.  During a consent search, the police violate the

12    suspect's Fourth Amendment right when they exceed the scope of the consent given.  *United*

13    *States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006).  "The standard for measuring the scope

14    of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what

15    would the typical reasonable person have understood by the exchange between the officer and the

16    suspect?"  *Jimeno*, 500 U.S. at 251 (internal citations omitted); *United States v. Lopez-Cruz*, 730

17    F.3d 803, 809 (9th Cir. 2013).  Importantly, "the government's burden to show voluntariness

18    cannot be discharged by showing no more than acquiescence to a claim of lawful authority."

19    *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004) (citation omitted).

20        Here, Detective Goold explained at the station that if Bauer invited them to do so, BPD

21    would examine the 3D printer, look at the frames he had already made, and check to see whether

22    he was manufacturing firearms for sale.  *See* Kane Decl., Ex. 7 at 18:10-23:00.  In the same

23    description, Detective Goold also told Bauer that they wanted to confirm that he was "not a school

24    shooter" and otherwise demonstrate where his "head was at."  *Id.*  Bauer verbally and

25    unequivocally affirmed his willingness to allow BPD to conduct such a search and then signed his

26    written consent on a form that stated such consent included "all portions of property under my

27    control."  *Id.*; Ex. 15.  The only limit on this search was Detective Goold's comment that they

28    would not search Bauer's parent's bedroom.  Ex. 7 at 18:10-23:00.  An objective review of this

                                                  22

1   record shows that Bauer thus granted BPD broad consent to search his home for evidence of

2   firearms manufacturing with the 3D printer as well as for evidence of Bauer's intentions to use any

3   firearms.

4           Bauer relies on *United States v. Lewis*, 81 F.4th 640, 652-53 (6th Cir. 2023), and *United*

5   *States v. Payton*, 573 F.3d 859, 862 (9th Cir. 2009), for the premise that BPD was obligated to

6   obtain specific consent for the search of his electronic devices beyond the broad consent he

7   granted to permit the search of his bedroom and the common areas of his home.  Reply at 18-19.

8   Though both cases considered the specific grant of authority necessary to search electronic devices

9   in light of the large amount of material they may potentially contain, neither case imposed a

10  brightline rule requiring law enforcement to obtain separate and distinct permission to search

11  electronic devices.  *See Payton*, 573 F.3d at 864 (confirming that there exists no heightened,

12  "technology-specific" Fourth Amendment protection and that the scope of electronic device

13  searches remains limited by "reasonableness").[3]  Bauer's reference to these cases thus fails to alter

14  the conclusion that the searches of the 3D printer and the PC generally fell within the scope of his

15  consent.  This is particularly so because Detective Goold told Bauer that the purpose of the search

16  was to discover information regarding the firearms Bauer had been 3D printing and his intended

17  conduct with his 3D printed firearms.  Ex. 7 at 18:10-23:00.

18          The parties further dispute whether Bauer's cooperation without objection during the

19  search of his home demonstrated that the search of the 3D printer and PC fell within the scope of

20  the initial consent.  In significant part, the Government avers that Bauer's conduct in the course of

21  the search, largely cooperating with detectives rather than objecting, demonstrated that the scope

22  of the search fell within the scope of his earlier consent to broadly search the home, including his

23

24  [3] Bauer repeatedly cites to cases in which the Ninth Circuit found that either (1) implied consent or
    (2) failure to object were not effective to permit law enforcement entry into a home.  *See* Reply at

25  13-14 (citing, e.g., *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990); *United States v.
    Bautista*, 362 F.3d 584, 589, 591 (9th Cir. 2004); *Rodriguez v. Mukasey*, 536 F.3d 1012, 1017 (9th

26  Cir. 2008)).  These cases are not particularly helpful in light of the express consent granted and
    other facts of this case.  Further, those cases clearly set a different standard than the one applicable

27  for Bauer's consent to search his electronic devices because they involve protection against law
    enforcement entry into the home absent express consent.  *Shaibu*, 920 F.2d at 1426 (noting the

28  government's burden to prove consent "is heaviest when consent would be inferred to enter and
    search a home").

United States District Court
Northern District of California

3D printer and PC.  While it is true that silence or "mere acquiescence to a claim of lawful authority" by themselves are insufficient to allow an inference of voluntary consent, *United States v. Shaibu*, 920 F.2d 1423, 1426-27 (9th Cir. 1990), Bauer's conduct while BPD conducted the search constituted more than mere acquiescence.  *Cf. United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) ("Failure to object to the continuation of a vehicle search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent" (internal quotation marks omitted)); *United States v. Mines*, 883 F.2d 801, 804-05 (9th Cir. 1989) ("Mines might have withdrawn or limited his consent, even during the search.  His failure to do so indicates he consented to the entire search and everything it revealed").

Detective Goold asked to look at the computer after finding the evidence that Bauer had printed an auto sear on the 3D printer in the bedroom.  Goold Decl. ¶ 11.  Bauer then stated that he accessed Telegram on the PC, Detective Goold said, "we can go to the PC if that works," and Mr. Bauer "gestured out of the room" and led him to the PC in a common area of the home.  Goold Decl. ¶ 12; Kane Decl., Ex. 8 at 7:50.  Bauer contends that his leading Detective Goold to the PC did not constitute consent and that it did not demonstrate consent to view the contents of the PC, Reply at 12, but that argument does not comport with the record, including video of his conduct.  It was Bauer who woke the computer up to show Detective Goold the contents of the Telegram app and the 3D printing program, Cura.  Goold Decl. ¶¶ 13-14; *cf. United States v. Rosi*, 27 F.3d 409, 413-14 (9th Cir. 1994) (affirming search where individual, after consenting to agents' request to enter home, "volunteered to an agent that pertinent evidence might be found in a lamp" with the "full expectation that the agents would search it" and "did not object when they proceeded to do so").  When Detective Goold asked if he could scroll through the Telegram app, Bauer remained leaned back in the chair and did not object, showing assent to Goold's use of the mouse.  Goold Decl. ¶ 13; Kane Decl., Ex. 7 at 11:00-12:30.  When Detective Goold inquired about the content of a particular Telegram channel, Bauer said, "I can show you," and then resumed use of the mouse himself.  *See id.*  Bauer's conduct was not mere acquiesce to the search of his electronic devices, he manifested consent.

1    Bauer contests that he granted effective consent to Detective Goold to search the PC

2    because a person in his "situation reasonably would believe they 'had no authority to limit or

3    withdraw their consent,' " Reply at 14 (quoting *McWeeney*, 454 F.3d at 1036), but Bauer fails to

4    identify any indicia of duress or coercion.  There is no indication that Detective Goold used "an

5    authoritative tone," that he threatened Bauer in any way, or that he led Bauer to believe that he had

6    no choice other than to show him his 3D printer and PC.  *Cf. United States v. Marquez*, 503 F.

7    Supp. 3d 1002, 1008 (S.D. Cal. 2020) (finding that similar factors demonstrated the absence of

8    duress or coercion for consent search of electronic device).  Rather than objecting at any point,

9    Bauer actively facilitated BPD's search, demonstrating that the search of his devices was

10   consistent with the scope of the voluntary consent he granted.

### 3.    Seizure of Devices

12    Bauer further challenges BPD's warrantless seizure of his property, including the 3D

13   printer, an SD card, and what was identified as an auto sear device.  Mot. at 16-17.  To seize

14   property without a warrant, law enforcement need only have probable cause to believe the

15   property contains evidence of a crime.  For example, in *United States v. Place*, the Supreme Court

16   stated:

> Where law enforcement authorities have probable cause to believe
> that a container holds contraband or evidence of a crime, but have
> not secured a warrant, the Court has interpreted the Amendment to
> permit seizure of the property, pending issuance of a warrant to
> examine its contents if the exigencies of the circumstances demand
> it or some other recognized exception to the warrant requirement is
> present.

21   462 U.S. 696, 701 (1984); *see also Kentucky v. King*, 563 U.S. 452, 462-63 (2011); *United States*

22   *v. Steinman*, 130 F.4th 693, 717 (9th Cir. 2025).  As explained above, the BPD officers present

23   had a lawful basis to enter Bauer's home and discover the property they seized – Bauer's consent.

24   Moreover, BPD officers had probable cause to believe that the property they seized, including the

25   3D printer, files, and an auto sear, included or constituted evidence of a crime, including

26   manufacture of machineguns.  *See, e.g.*, Goold Decl. ¶¶ 14-15 (discussing 3D-printed auto sears,

27   "I asked, 'so you're trying to manufacture fully automatic pistols?' I then told him that it was 'a

28

United States District Court
Northern District of California

1    solid felony.' "). The property seized following the September 6, 2024 consent search need not

2    face suppression.

3          **E.      March 3 Warrant and March 5 Execution of the Warrant and Search**

4          Bauer initially challenged the sufficiency of the March 3 warrant on several grounds,

5    including (1) the warrant's reliance on evidence, including the statements and evidence gathered

6    on September 6, 2024, that must be excluded on the basis of his other challenges, (2) the warrant

7    was unsupported by probable cause, and (3) the warrant fails as both insufficiently particular and

8    overbroad.[4] But in his Reply brief, Bauer states, "If the Court were to find no prior constitutional

9    violations, Mr. Bauer would agree that the March 3 warrant authorized the *seizure* of the PC."

10    Reply at 18. The Court has found no constitutional violations in law enforcement's conduct prior

11    to this point of its analysis. Accordingly, and in light of Bauer's concession, the Court finds that

12    the March 3 warrant authorized the seizure of the PC.

13          Bauer argues separately, however, that the March 5 search of the PC violated the Fourth

14    Amendment, apparently challenging the ChatGPT-related content that FBI agents found in plain

15    view at the time they seized the PC on March 5. *See* Reply at 18-20. The Court considers

16    whether the plain view exception covers the ChatGPT-related content to the extent it was used to

17    inform the March 10 warrants.

18          Under the plain view doctrine, "the government may seize evidence without a valid

19    warrant so long as government officials are 'lawfully searching the area where the evidence is

20    found' and 'the incriminatory nature of the evidence [is] immediately apparent.' " *United States v.*

21    *Holcomb*, 132 F.4th 1118, 1135 (9th Cir. 2025) (alteration in original, citation omitted). "The

22    burden of demonstrating that both requirements are satisfied lies with the Government." *Id.* at

23    1135 (citation omitted).

24

25

26    ───────────────

27    [4] In addition, Bauer argued in his initial brief that he was entitled to *Franks* hearing to challenge
the veracity of the statements made in support of the March 3 search warrant. Mot. at 20-21
(referring to *Franks v. Delaware*, 438 U.S. 154 (1978)). In his Reply brief and at the hearing,

28    Bauer abandoned this argument. The Court accordingly denies the request for a *Franks* hearing as
moot.

1    Here, the FBI was lawfully present in Bauer's home on March 5, 2025, in the process of

2    seizing the PC pursuant to the March 3 warrant.  *See* Kane Decl., Ex. 16; *see also* Ex. 17 (March

3    10 search warrant & Furtado Affidavit thereto).  Though Bauer argues that the Government fails to

4    establish that agents were "lawfully searching" the PC when they obtained the 353 photos of

5    computer contents on March 5, *see* Reply at 19, the March 3 warrant authorized the Government

6    to search the PC.  In relevant part, the March 3 warrant authorized agents to seize "evidence of

7    who used, owned, or controlled the COMPUTER at the time the things described in this warrant

8    were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames

9    and passwords, documents, browsing history, user profiles, email, email contacts, 'chat,' instant

10   messaging logs, photographs, and correspondence."  *See* Ex. 16, Att. B. at 2.  Indeed, when the

11   FBI found the PC to be seized, it was "powered on, with an open browser pulled up to Open AI's

12   ChatGPT."  *Id.*, Ex. 17 (Furtado Aff. ¶ 20).  This satisfies the first prong – the agents were

13   lawfully present in the area where the ChatGPT prompts were in plain view, and they were

14   authorized to review the PC for evidence including Bauer's browsing history.  Second, the

15   incriminatory nature of the evidence was immediately apparent to the agents because the ChatGPT

16   queries indicated an effort to manufacture an automatic firearm or convert a semiautomatic

17   firearm into a fully-automatic weapon.  *Id.*, Ex. 17.  Moreover, the ChatGPT queries regarding

18   mass shootings, where Jews live, and ways to manufacture automatic firing capacity immediately

19   raised the prospect of violence motivated by religious animus.  *Id.*, Ex. 17 (Furtado Aff. listing

20   prompts including "How much is the fire rate of an ar with a yankee boogle?"; "what are different

21   names for an ar 15 drop in auto sear/selector"; "Top ten American metro areas with the most

22   jews"; "What is the definition of a mass shooting").  The incriminating nature of these queries was

23   heightened for the agents given the context of the September 6, 2024 arrest and search, including

24   the discovery of Bauer's earlier attempts to manufacture automatic firearms, including auto sears.

25   Though Bauer attempts to undermine the significance of those ChatGPT prompts by highlighting

26   other, more benign prompts included among the approximately 317 pages of photographs

27   depicting his ChatGPT history, *see* Reply at 19, such dilution does not alter the incriminating

28   nature of the prompts identified by the FBI.  Therefore, the ChatGPT prompts discovered in the

1   course of executing the warrant on March 5 were appropriately found in plain view and do not

2   face suppression.

3           **F.      March 10 Search Warrant**

4           Bauer argues that the searches based on the March 10 warrants violated the Fourth

5   Amendment because (1) the warrants were the fruit of prior constitutional violations, (2) the

6   warrants were unsupported by probable cause, (3) the warrants were insufficiently particular and

7   overbroad, (4) the FBI's intrusion into his Internet activity in the course of the searches raised

8   First Amendment concerns.  *See* Mot. at 21-23.  For the reasons provided above, the Court finds

9   no constitutional violation that would support suppression up to this stage of its analysis.  Further,

10  as conceded by Bauer, his remarks about the First Amendment implications of the FBI's conduct

11  do not rise to the level of a challenge to the sufficiency of the warrant and therefore do not

12  mandate suppression.  *See* Reply at 20.  Accordingly, the Court turns to address whether the

13  March 10 warrants were supported by probable cause as well as whether they were sufficiently

14  limited in breadth and particularity.  After that discussion, the Court considers the Government's

15  argument that suppression is not necessary because the FBI relied on the warrants in good faith.

16          **1.      Probable Cause**

17          Probable cause exists when, under the totality of the circumstances, "there is a fair

18  probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v.*

19  *Gates*, 462 U.S. 213, 238 (1983).  Whether there is probable cause is a "commonsense practical

20  question," and "[n]either certainty nor a preponderance of the evidence is required."  *United States*

21  *v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (internal quotation marks omitted).  "A court

22  evaluating the constitutionality of a search conducted pursuant to a search warrant issued by a

23  magistrate reviews the magistrate's probable cause determination for clear error."  *United States v.*

24  *Nguyen*, 673 F.3d 1259, 1263 (9th Cir. 2012) (citation omitted).  On review, the duty of the court

25  "is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable

26  cause existed."  *Gates*, 462 U.S. at 238-39 (internal quotations and citation omitted, modifications

27  in original).  If "the magistrate had a substantial basis for . . . conclud[ing] that a search would

28  uncover evidence of wrongdoing, the Fourth Amendment requires no more."  *Id.* at 236 (internal

United States District Court
Northern District of California

United States District Court
Northern District of California

1    quotations and citation omitted, modifications in original).  Reviewing courts pay "great

2    deference" to the issuing judge's determination of probable cause.  *Id.* at 236.  So long as the

3    issuing judge had a "substantial basis for concluding that a search would uncover evidence of

4    wrongdoing," the probable cause determination will be affirmed.  *Id.* at 236 (quoting *Jones v.*

5    *United States*, 362 U.S. 257, 271 (1960)) (internal marks omitted).

6            The probable cause laid out in the March 10 warrant affidavits included information

7    regarding Bauer's use of a 3D printer to manufacture firearms and machineguns at home.  *See,*

8    *e.g.*, Kane Decl., Ex. 17 ¶¶ 9-11.  It also included that BPD had seen evidence of the 3D printing,

9    including the auto sear, on the PC.  *Id.* ¶ 12.  Both March 10 warrants established additional

10   probable cause to search for evidence, fruits, or instrumentalities of violations of Title 18 U.S.C.

11   § 249(a)(1), along with the violations related to the illegal auto sear.  The additional probable

12   cause was based on Bauer's demonstrated interest in guns, including known manufacture of a

13   firearm and auto sear, combined with the evidence the FBI found in plain view when it seized the

14   Windows PC on March 5, 2025, pursuant to the first warrant.  The evidence regarding potential

15   hate crimes also included statements from Bauer and his parents.  Together, this information

16   showed defendant was capable of manufacturing a fully automatic weapon, had an interest in mass

17   shootings and mass shooters, was querying ChatGPT about firearms, including guns that can be

18   modified to fire automatically, "hate[d] Jews," and for locations where Jews lived.  *See* Kane

19   Decl., Ex. 17 ¶¶ 12-25.  Bauer's argument that the evidence underlying the warrant affidavit falls

20   short misapprehends the applicable standard – the Government was not required to prove a

21   violation of Section 249(a)(1) at that stage, it was merely required to establish a "fair probability"

22   of unearthing incriminating evidence if the warrant issued.  *Gates*, 462 U.S. at 238.  The affidavits

23   accomplished that end.  The affidavits provided Magistrate Judge Illman a "substantial basis" to

24   conclude that "a search would uncover evidence of wrongdoing."  *Id.* at 236.  In accordance with

25   the deference owed, the Court affirms Judge Illman's probable cause determination.[5]

26

27   ─────────────────

28   [5] Chief Magistrate Judge Ryu's probable cause determination for seizure of the PC based on a
     related record further buttresses Judge Illman's probable cause determination for the rollover
     warrant.  *See* Kane Decl., Ex. 16.

### 2.      Specificity

Bauer contends the March 10 warrants were insufficiently specific.  The Fourth Amendment requires specificity in two important regards: "breadth and particularity."  *United States v. Holcomb*, 132 F.4th 1118, 1127 (9th Cir. 2025).  "Breadth is the requirement that a warrant 'be limited by the probable cause on which the warrant is based,' while particularity is the requirement that a warrant 'clearly state what is sought.' "  *Id.* at 1127 (quoting *United States v. SDI Future Health Inc.*, 568 F.3d 684, 702 (9th Cir. 2009)).

Bauer avers that the 13 categories of computer-related records that the warrant authorized agents to search for and seize were temporally unlimited and extremely broad.  Kane Decl., Ex. 17, Att. B-1 ¶¶ 2-9; Ex. 18, Att. B-2 ¶¶ 1-8.  These categories covered "evidence indicating how and when the computer was accessed or used," "records of information about the computer's internet activity," "evidence of the times the computer was used," and "contextual information necessary to understand the evidence described in this attachment."  *Id.*  The affidavit submitted by Special Agent Furtado laid out the evidence regarding Bauer's possession and manufacture of the machinegun conversion device in detail, specifying that it occurred at the location to be searched.  *See, e.g.*, Ex. 17 (Furtado Aff. ¶¶ 12-17) (describing the September 2024 search, the discovery of the 3D-printed auto sear, and the testing of the machinegun conversion device).  She noted the evidence that Bauer had used the PC to search for information regarding auto sears and that he had the program for his 3D printer on the PC.  *Id.*  Special Agent Furtado's affidavit also contained a section discussing "Computers, Electronic Storage, and Forensic Analysis."  *See, e.g.*, Ex. 17 (Furtado Aff. ¶¶ 30-33).  Among other things, she attested in that section that files can persist on computers for long periods of time, even if overwritten.  *Id.*  These particular factual considerations provided the necessary fair probability of finding evidence in the computer to establish probable cause.

Moreover, Attachment B to the warrants added specific categories of records to be seized.  The categories were tied to the violations at issue and to the identification of co-conspirators in those violations.  Kane Decl., Ex. 17, Att. B-1 ¶¶ 2-9; Ex. 18, Att. B-2 ¶¶ 1-8.  Attachments B-1 ¶ 10(a)and B-2 ¶ 9(a) authorized seizure of "evidence of who used, owned, or controlled the

1    COMPUTER at the time the things described in this warrant were created, edited, or deleted," thus

2    providing a temporal limitation and a link to the probable cause.  Moreover, in this case, the issue

3    of who used the Windows PC in connection with the violations is relevant because it was located

4    in a common area of Bauer's home, where his parents and brother could have accessed it, and

5    apparently unprotected by a password.  Therefore, the warrants were sufficiently limited to guide

6    the bounds of the FBI's search given the context of the probable cause and the facts of the case.

### 3.    Good Faith

8        Having found the March 10 warrant valid, the Court need not address the Government's

9    alternative argument that the FBI's good faith reliance on the warrant overcomes any defects.  The

10    Court takes up this argument, however, in a belt-and-suspenders approach.

11        When a warrant fails as constitutionally infirm, evidence seized during its execution should

12    generally be suppressed under the exclusionary rule.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

13    However, an exception to the exclusionary rule exists where an officer, in good faith, reasonably

14    relies on a defective search warrant.  *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir.

15    2013).  "[A] warrant issued by a magistrate normally suffices to establish that a law enforcement

16    officer has acted in good faith in conducting the search."  *United States v. Leon*, 468 U.S. 897, 922

17    (1984) (internal quotation marks and citation omitted).  But the good faith exception does not

18    apply where an affidavit is " 'so lacking in indicia of probable cause as to render official belief in

19    its existence entirely unreasonable' " or "where the warrant is 'so facially deficient – i.e., in failing

20    to particularize the place to be searched or the things to be seized – that the executing officers

21    cannot reasonably presume it to be valid.' "  *Underwood*, 725 F.3d at 1085 (quoting *Leon*, 468

22    U.S. at 923).  In *Leon*, the Supreme Court held that evidence seized by police officers acting in

23    good faith pursuant to a facially valid warrant would be admissible even though the warrant was

24    subsequently found to lack probable cause.  *Id.*, 468 U.S. at 926; *accord Pearson v. Callahan*, 555

25    U.S. 223, 241-42 (2009).  *Leon* articulates four circumstances in which the good faith exception

26    does not apply on the ground that reliance is per se unreasonable:

27            (i) where an affiant misleads the issuing magistrate or judge by
             making a false statement or recklessly disregarding the truth in
28            making a statement; (ii) where the magistrate or judge wholly

United States District Court
Northern District of California

> abandons [their] judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citing *Leon*, 468 U.S. at 923-26).

This is not a case where the affiant presented false information to the issuing judge or where the warrant is "so lacking in indicia of probable cause" or "so facially deficient" that the executing officers could not reasonably believe the warrant to be valid. *See Crews*, 502 F.3d at 1136. As discussed at length above, the warrants described in detail the circumstances of defendant's arrest by BPD and the evidence that he had manufactured a firearm and led to the conclusion that he could be manufacturing more, including a machinegun conversion device, at home. Indeed, two federal Magistrate Judges separately reviewed the warrant affidavits, and they both found that the warrant applications were supported by probable cause. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'") (quoting *Leon*, 468 U.S. at 922-23). The affidavits supporting the federal warrants are thus nowhere near the "bare bones" affidavits that would justify imposing the "substantial social costs generated by the [exclusionary] rule." *Davis*, 564 U.S. at 237 (internal quotation marks omitted). As a result, even if the Court had found the March 10 warrant defective, the good faith exception would apply. The evidence obtained from execution of the warrant is not subject to exclusion.

### G.      Cell Phone Password

Bauer finally argues that the contents of his cell phone must be suppressed because the FBI obtained his cell phone password in violation of the Fourth Amendment and *Miranda*. Mot. at 23-25. In particular, Bauer argues that the FBI violated his Fifth Amendment rights against self-incrimination when it asked for his passcode while he was in custody and un-*Mirandized*. Mot. at 23-24. The Government argues that there is no need to suppress the evidence flowing from Bauer's un-*Mirandized* disclosure of his password because Bauer's statement was voluntary.

1   Opp. at 37. Because the Court finds that the Government fails to bear its burden on this Fifth

2   Amendment challenge, it does not reach the other two bases for exclusion.

3           It is the Government's burden to prove by a preponderance of the evidence that a criminal

4   defendant's statement was voluntary. *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.

5   1981). Where a defendant alleges psychological coercion, courts "look to the totality of the

6   circumstances surrounding a confession." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th

7   Cir. 2003). Such circumstances include "the youth of the accused, his intelligence, the lack of any

8   advice to the accused of his constitutional rights, the length of detention, the repeated and

9   prolonged nature of the questioning, and the use of physical punishment such as the deprivation of

10  food or sleep." *Id.* The failure to give *Miranda* warnings creates a "generally irrebuttable"

11  "presumption of coercion." *United States v. Patane*, 542 U.S. 630, 639 (2004) (plurality).

12          The Government attempts to analogize this case to *United States v. Amiri*, No. 23-CR-

13  00264-JSW-2, 2024 WL 3757507, at *20 (N.D. Cal. Aug. 12, 2024) in which the district court

14  found that the contents of phone admissible because the defendant provided his passcode

15  voluntarily. *See* Opp. at 38. This case is distinct, however, because agents elicited Bauer's

16  passcode while he was in custody but before the issuance of *Miranda* warnings. *See* Ex. H. On

17  the other hand, Bauer relies on *United States v. Maffei*, No. 18-cr-00174-YGR-1, 2019 WL

18  1864712, at *8-11 (N.D. Cal. Apr. 25, 2019), but that case is also distinct because the court

19  suppressed defendant's disclosure of her phone passcode based on a violation of the defendant's

20  unambiguous invocation of her right to counsel, a situation not present here. *See* Reply at 22-23.

21          Here, the evidence must be suppressed for a separate reason than those identified in either

22  *Amiri* or *Maffei* – the Government fails to bear its burden to show Bauer's disclosure of his

23  password was voluntary. *See Tingle*, 658 F.2d at 1335. Bauer was asleep when seven law

24  enforcement officers arrived at his home to execute federal search and arrest warrants. Fryzek

25  Decl., Ex. H. Officers searched and handcuffed him and took his cell phone from his pocket. *Id.*

26  In addition, Bauer had been surrounded by armed and uniformed FBI agents, handcuffed, pat-

27  searched, led to a different room, had his phone seized from his pocket by an agent, and had

28  another agent start to search it by swiping on it before she turned it towards him and said, "What's

your passcode, man?"  Kane Decl., Ex. 13; Ex. 14.  The Government acknowledges that Bauer was in custody at this point.  Opp. at 37.  The agents had not advised him of his rights.  Ex. O. Bauer was 20 years old and had no criminal record.  The agents possessed a warrant for Bauer's phone, but the way they informed him of the warrant just before asking for his password gave the impression that the warrant also required him to provide his password, which was not so.  Despite the Government's argument that Bauer voluntarily disclosed his phone passcode, considering the totality of the circumstances, the Government fails to prove, much less by a preponderance, that the disclosure was voluntary.  There is no evidence of voluntariness on this record.  Therefore, the contents of Bauer's cell phone and fruits flowing from it must be suppressed.

The Government attempts to evade this conclusion based on the inevitable discovery of the evidence through the March 10 warrant's permission to use biometric unlocking of the device. *See* Opp. at 38.  "However, the government bears the burden of demonstrating, based on a preponderance of the evidence, that the [evidence] would have been inevitably discovered." *United States v. Bradford*, 772 F. App'x 554 (9th Cir. 2019) (citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000)).  Though the Government's contention may indeed be likely given the scope of the valid warrant, "the record is silent as to what would have happened next," and the Government thus fails to meet is burden to invoke the protections of the inevitable discovery doctrine.  *Bradford*, 772 F. App'x at 555.

III.    CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** Bauer's motion to suppress.  The Court **SUPPRESSES** the contents of Bauer's cell phone and fruits flowing from the Fifth Amendment violation, but the Court finds no other evidence merits suppression at this stage.

**IT IS SO ORDERED.**

Dated: September 2, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**